IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALBERT TADERERA | No. 17-cr-10158-FDS-1 |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OMNIBUS MOTION IN
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

**I.     Motion for Bill of Particulars (D.E. 51)**

The government did not respond to Taderera's request for a bill of particulars. It has represented to defense counsel, as well as on the record in front of Judge Bowler, that it will not seek to use or introduce evidence of any uncharged bank robberies as evidence that Taderera committed bank robbery as charged in the indictment. *See* D.E. 59.[1] Until that stipulation is entered in a binding, written form, Taderera continues to press his request for a bill of particulars and takes the government's lack of a response as a waiver of opposition and assent to the motion.

**II.    Reply to Government's Response (D.E. 61 at 12-21) to Motion to Suppress and Exclude
         Identification by Ex-Wife (D.E. 53)**

First and foremost, the government has represented to the defense that it will not seek to use or introduce evidence of *any* uncharged bank robberies. *See* above.  Taderera believes that this compels a finding in his favor on the identification issue, mooting many of the arguments raised in the motion. If the uncharged robberies do not come in, the ex-wife's identification of Taderera as the perpetrator of those robberies cannot come in, as a direct application of Rule 401. Any chain of relevancy for the identification

---

[1] Taderera has requested the transcript from the hearing but not yet received it.

1

testimony includes, as a necessary link, the existence of those uncharged robberies and Taderera's status as the perpetrator. Because Manuelpillai did not identify Taderera in *this* robbery, her identification is not direct evidence of identity in this case.

Nonetheless, Taderera addresses the government's arguments below. The government initially argues that the Court should not address any of the grounds for suppression/exclusion at this juncture, except for the suggestive identification argument. *See* D.E. 61 at 12-13, 16. Yet, on January 8, 2018, the Court authorized – indeed, ordered – the defense to file any "motions concerning issues with identification of witnesses" by March 19. *See* D.E. 43. The ex-wife's identification is the linchpin of the government's case. It also vastly expands the scope of the government's case by implicating multiple uncharged bank robberies. For these reasons, Taderera's ability to mount a defense depends on an early adjudication of this issue.

    1. *Suggestive identification*
     *(Govt. Resp., D.E. 61, at 13-16, responding to Mot., D.E. 53, at 21-23)*

The parties agree on the two-step procedure for determining whether an identification must be suppressed: first, asking "whether there was an impermissibly suggestive procedure;" and second, "whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure." *United States v. Henderson,* 320 F.3d 92, 100 (1st Cir.2003) (internal quotation marks and citations omitted).

The government wrongly suggests that there is a categorical exclusion from the doctrine of suggestive identification for witnesses who are familiar with the defendant. A witness's familiarity with the defendant goes to second prong; it "substantially increases the reliability" of the identification. *Haliym v. Mitchell,* 492 F.3d 680, 707 (6th Cir. 2007). Familiarity does not inoculate the identification.

The Court must still begin with the first prong: whether law enforcement's procedure was impermissibly suggestive. That prong "can be broken down into two constituent parts: that concerning the

2

suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *United States v. Holliday,* 457 F.3d 121, 125 (1st Cir.2006); *see also Wright v. Marshall*, No. CIV A 98-10507-PBS, 2009 WL 3764024, at *6-7 (D. Mass. Nov. 9, 2009), *aff'd,* 656 F.3d 102 (1st Cir. 2011).

Here, the FBI told Manuelpillai outright that they suspected Taderera of being the Incognito Bandit, responsible for sixteen bank robberies. The profile they used to set the stage was itself suggestive. The basis for aggregating the sixteen robberies is questionable, when each robbery is evaluated individually. And the chief piece of evidence to support the argument that the FBI's tactic was suggestive is the result. It actually *elicited a false identification*: Manuelpillai identified Taderera in the most repeated, clear-quality images they showed her – those from the Woburn robbery. Yet the suspect in that robbery is a *white* male.

Moreover, the procedure was unnecessary because no exigent circumstances were present. The Agents could have shown Manuelpillai comparator images of different bank robbers. The internet is replete with images of bank robbers dressed from head to toe in black, completely covered, wearing hoodies and gloves.[2] But the FBI did not want Manuelpillai to be confused. They wanted to create the circumstances that were most likely to elicit the identification that they wanted. And they were so successful that she identified someone who could not have been Taderera.

Regarding the second, reliability prong, the government is correct that familiarity with the witness increases reliability. However, the reliability of the identification was not borne out. She identified her ex-

---

[2] A quick search turned up these: http://clarksvillenow.com/local/legends-bank-on-tiny-town-rd-robbededit/ (image from 2017 bank robbery in Clarksville, Tennessee, robber described as a "black male wearing a face mask. He is approximately 6 feet tall with a thin build and was dressed in black"); http://txktoday.com/news/bancorpsouth-on-state-line-robbed-at-gunpoint/ (image from 2017 bank robbery in Texarkana, Arkansas by robber described as a "black male approximately 5'9", wearing all black with a black mask and gloves [and ] brandishing a silver handgun"); https://patch.com/illinois/parkridge/park-ridge-bank-robbed-masked-man (image from 2017 bank robbery in Park Ridge, Illinois by "a man wearing a zipped-up slender gray hooded sweatshirt pulled over a dark baseball cap with a black brim [,] dark sunglasses, a black fleece facemask pulled over his nose, black jeans, black shoes and knitted gray work gloves").

husband as someone who the witnesses described as a white male. Furthermore, the quality of the remaining images is extremely poor, bordering on inscrutable. In light of the images themselves, the false Woburn identification, and Manuelpillai's initial failure to make an identification, the identification is unreliable.

> 2. *Inadmissibility of* any *evidence of extrinsic bank robberies under Rule 404(b) (Govt. Resp., D.E. 61, a 16-19, responding to Mot., D.E. 53, at 10-18)*

As discussed above, the government has represented that it will not seek to use or admit evidence of any of the uncharged robberies, including the robberies that Manuelpillai identified Taderera in. *See* D.E. 53 at 4-9, 15-16 (describing subject of identification(s)). This compels the conclusion that the identifications are inadmissible. The only conceivable probative value of Manuelpillai's identifications is as evidence that Taderera committed the uncharged robberies, which factually the government then argues is probative of the robber's identity in *this* case. There is simply no theory of relevancy for the identifications that does not have, as "necessary link[s] in the inferential chain," the existence of the uncharged robberies and Taderera's status as the perpetrator of those robberies. *United States v. Varoudakis*, 233 F.3d 113, 120 (1st Cir. 2000) (internal quotation marks and citation omitted). Without admitting the uncharged robberies, there can be no identification of Taderera as the perpetrator of those robberies.

Even without the government's stipulation, the identifications are inadmissible under Rules 404(b) and 403. *See* D.E. 53 at 10-18. The government in response offers only the special relevancy theory of "common identity." D.E. 61 at 16. It cites *United States v. Ingraham*, 832 F.2d 229, 231-33 (1st Cir. 1987). *See id.* Yet in *Ingraham*, the defendant *admitted* that he had written the letters whose admissibility was in debate. *Id.* at 232. Where the defendant was charged with making a menacing phone call, whose subject matter was identical to that of the extrinsic letters, the Court found that the subject matter of both was so obscure that the "likelihood of pure coincidence [that more than one individual had called/written on this topic] is

4

miniscule." *Id.*[3] *Ingraham* cited and applied the same standard the parties agree on here: "for a practice to be attributable to the accused, it must contain what amounts to [the defendant's] 'signature.'" *Id.* at 232. The "signature need be but a fair congener, not a facsimile or exact replica." *Id.* Taderera does not debate that standard.

*Ingraham* does little to inform the Court's application of that standard to this bank robbery case. Nor does the government's next citation, to the *Trenkler* case. *See* D.E. 61 at 17. In *Trenkler*, as in *Ingraham*, there was no dispute that the defendant had committed the prior bad act. *See United States v. Trenkler*, 61 F.3d 45, 52 (1st Cir. 1995). In a prosecution for building a bomb, the Court admitted evidence that the defendant had previously built a bomb, on the theory that the two devices were similarly constructed and therefore the extrinsic bomb-making incident was "relevant on the issues of identity, skill, knowledge, and intent." *Id.* at 48. The First Circuit reviewed for abuse of discretion and found none. It listed the similarities in the bombs' technical construction, *see Id.* at 54, and further noted that "bombing, in and of itself, is, arguably, a fairly distinctive method for intimidating or killing an individual." *Id.* at 55.[4]

---

[3] Indeed, when we look at the similarities the Court actually relied on, *Ingraham* looks markedly different than the instant case:

> It is readily apparent, on the most casual examination, that the maker of the illicit call (X) and the author of the letters (concededly, Ingraham) shared a peculiar obsession with the same obscure litigation. They shared, too, an unusual campaign to commandeer the assistance of the same four public officials—an odd quartet drawn from federal and state government, and from the executive, legislative, and judicial branches—threatening them with dire consequences if they demurred…. It beggars credulity to argue that so striking a set of seldom seen similarities was but some strange coincidence. Rather, common sense underwrites the conclusion that these shared characteristics were so idiosyncratic as to constitute a signature—a signature sufficient to validate an inference that the person who wrote the letters also made the call.

*Ingraham*, 832 F.2d at 233 (citations omitted).

[4] The Court summarized:
> Both bombs were remote-controlled, radio-activated, electronic explosive devices. Both were homemade mechanisms, comprising, in general, electronic components easily purchased at a hobby store. Both had similar, though not identical, firing and fusing circuits with separate battery power supplies for each. Both had switches in their fusing circuits to disconnect the radio receivers. To energize their respective radio receivers, both devices utilized similar power supplies, consisting of four AA batteries. Both employed many similar components such as batteries, duct tape, toggle switches, radio receivers, antennas, solder, electrical tape, and large round speaker magnets. Moreover, both used a distinctive method (i.e., twisting, soldering, and taping) to connect some, though not all, of the wires used.

*Trenkler*, 61 F.3d at 54.

*Trenkler* therefore does not provide much guidance here. Of all of the government's cases, *see* D.E. 61 at 16-17, *Myers* is the only bank robbery case. And *Myers* cuts in Taderera's favor. *Myers rejected* the admission of an extrinsic bank robbery, offered to show identity, finding these factors insufficiently distinctive:

> (1) both crimes were bank robberies, (2) perpetrated by Coffie and Myers, (3) between two and three o'clock in the afternoon. In both robberies the victimized bank was (4) located on the outskirts of a town, (5) adjacent to a major highway. In both robberies the participants (6) used a revolver, (7) furnished their own bag for carrying off the proceeds, and wore (8) gloves and (9) masks crudely fashioned from nylon stockings. Finally, (10), in one of the banks, two women employees were present; in the other, five women employees were present.

*Id.* at 1046. The court noted the particular high standard for admissibility that applies when evidence is offered to show identity: "A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind." *Id.* at 1045, *cited approvingly in United States v. Fields*, 871 F.2d 188, 197 (1st Cir. 1989).

*Myers*, as well as the bank robbery cases cited by Taderera, make clear that when extrinsic crimes are offered as modus operandi evidence to show identity, the court must perform a robust gate-keeping function and determine whether the uncharged and charged acts are so idiosyncratic/distinctive so as to function like a signature. *See* D.E. 53 at 11-15; *United States v. Carroll*, 207 F.3d 465, 468-70 (8th Cir. 2000) (collecting cases); *United States v. Adams*, No. CR 13-291 RHK/LIB, 2014 WL 12690185 at *3 (D. Minn. Mar. 27, 2014); *United States v. Vaughan*, No. 05-40157-JAR, 2009 WL 3807084 at *5-8, *10-15 (D. Kan. Nov. 12, 2009). Under the standard set forth in these cases, the present uncharged bank robberies do not pass muster.

The government's final point is that the totality of the "common characteristics" of the uncharged bank robberies is sufficient to satisfy the signature-like standard. First, the government inaccurately invokes a "consistency across the robberies." D.E. 61 at 61; *cf.* D.E. 53 at 12-13; *see also id.* at 6-9

6

(reviewing the robberies that were potentially the subject of the identification(s)). There *is* no consistency. What Taderera is requesting is that the Court hold each proffered extrinsic robbery up to the daylight and evaluate, for each one, the similarities and differences to the Wayland robbery. As Taderera has indicated, the suspect descriptions across the 16 robberies vary in height from 5'8" to 6'1", in race from white to light-skinned black to Hispanic to Latino. Some witnesses reported the robber had an accent; others said no accent. A vehicle was involved in four of them. The woods were involved in some of them. When the government invokes "consistency," it is relying on a fictional amalgam. The law requires it to disaggregate the robberies and subject each one to analysis.

Finally, the government fails to address Taderera's argument that there is insufficient evidence that he *committed* the extrinsic robberies here to permit their introduction. *See* D.E. 53 at 15-17. This is a second dimension of conditional relevancy that he has identified. *See id.* As addressed in the motion, there is insufficient evidence from which a jury could "reasonably conclude … that the defendant was the actor." *Huddleston*, 485 U.S. 681, 689 (1988).

> 3. *Inadmissibility as lay witness testimony under Rule 701*
>    *(Govt. Resp, D.E. 61, at 18, responding to Mot., D.E. 53, at 18-20)*

The government's paragraph on the lay witness issue, *see* D.E. 61 at 18, fails to meaningfully engage with the issues Taderera raises. *See* D.E. 53 at 18-20. The government makes no counter to the argument that the images are so inscrutable as to leave Manuelpillai in no better position than an unfamiliar observer. *See United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011). *See also* images at D.E. 53 at 7-9 and discussion of video footage at D.E. 52 at 15-16. An evidentiary hearing is required for Manuelpillai to make clear, for the record, which photographs and/or videos she identified Taderera in and articulate the basis for the identification. Only after that evidence has been received can the Court evaluate whether her testimony would be helpful under Rule 701.

*4. Evidentiary hearing*
 *(Govt. Resp, D.E. 61, at 20-21)*

An evidentiary hearing is absolutely required on the identification issue in order to answer the question of *which* footage the ex-wife purported to identify Taderera in – *ie. which* bank robberies she has linked him to. Taderera is entitled to know, well before trial, which bank robberies he is implicated in. Without that basic information, he cannot prepare a constitutionally adequate defense. And the Court can obtain that factual information by holding an evidentiary hearing.

**III.    Reply to Government's Response (D.E. 61 at 21-27) to Motion to Suppress Fruits of an Unlawful Arrest (*Franks* Motion) (D.E. 52)**

The government does not appear to contest Taderera's arguments that (a) the identification is infirm and (b) the Agent materially misrepresented the identification, whether affirmatively or by omission.

Instead, the government's main argument is that that there was probable cause for the arrest even without the identification. *See* D.E .61 at 22-24. The government's argument fails for the simple reason that probable cause must be tied *to the crime for which the arrest is sought. See Giordenello v. United States*, 357 U.S. 480, 487 (1958) (magistrate's task is "to assess independently the probability that petitioner committed *the crime charged*" (emphasis added)); Fed. R. Crim. P. 4 (affidavit must show "probable cause to believe that an offense has been committed and that the defendant committed it").

The government sought Taderera's arrest on charges that he robbed a bank in Wayland. Yet absent the identification, its affidavit contained not a scintilla of evidence connecting its probable cause showing to the crime charged. It attempts a finesse, asserting that Taderera's "precise match to the Incognito Bandit profile, coupled with his flight attempt[,] amounts to an 'assemblage of interlocking pieces [that] reveals a mosaic that clearly depicts probable cause.'" D.E. 61 at 24 (citation omitted). A mosaic that clearly depicts probable cause *of what*? The pronouncement of a "precise match" to such a generic description – a 6-foot tall thin black man driving a black BMW, with sunglasses – is hyperbole. Taderera

8

addressed the level of specificity required to sustain a probable cause finding based on a suspect/vehicle description in his motion. *See* D.E. 52 at 12-14. This description falls short and cannot sustain the probable cause finding. *See Id.*

All the government is left with is its consciousness of guilt evidence. Yet consciousness of guilt *of what?* All the consciousness of guilt in the world does not supply the required nexus to the crime charged. A suspect's attempt to flee could indicate consciousness of guilt of tax evasion. Of murder. Of driving a stolen vehicle. The government's logic is circular: it argues that he is guilty because he knows he is guilty. Yet there is no evidence that Taderera was told by law enforcement that he was stopped in Concord as part of an investigation into the Wayland robbery; that his car was being held in conjunction with the Wayland robbery; or that law enforcement was investigating a bank robbery in Wayland at all. Consciousness of guilt – untethered to the crime charged, particularly when there are 16 bank robberies the government has implicated – is insufficient, as a matter of law, to demonstrate the probable cause required under *Giordenello* and Rule 4. Evidence that he committed crime A is insufficient to sustain an arrest warrant on crime B. A nexus to the crime charged is required. Its absence here is fatal.

Having established that the affidavit – without the identification – does not establish probable cause, the only remaining question is whether the identification, accurately portrayed, would have gotten the government over the hump. Taderera addresses this in his motion. *See* D.E. 52 at 14-16. The government offers no response, seeming to concede that the value of the identification is negligible.

The government's only other argument is that Taderera cannot show that the agent's misrepresentation/omission was reckless. *See* D.E. 61 at 26-27. Under the clear law of this Circuit, however, recklessness can be inferred from to the materiality of the omission. *See* D.E. 52 at 9-10; *Burke v. Town of Walpole*, 405 F.3d 66, 81-82 (1st Cir. 2005). The government incorrectly attempts to invoke a higher standard. *See* D.E. 61 at 26.

In sum: the evidence in the affidavit, absent the identification, is insufficient to show probable cause on the Wayland robbery. As the government implicitly concedes, the ex-wife's potentially false identification in a different robbery does little to add to the government's showing. Taderera is entitled to a *Franks* hearing.

### IV. Reply to Government's Response (D.E. 61 at 9-12) to Defendant's Motion to Suppress Evidence Resulting from an Unlawful Motor Vehicle Stop (D.E. 54)

A police officer may briefly detain an individual for questioning if the officer observes conduct that would lead a reasonable officer to conclude that a crime has been committed or criminal activity is underway. *United States v. Arvizu*, 543 U.S. 266, 273 (2002). Facts related to reasonable suspicion are examined under a totality of the circumstances. *Id.* at 274. Taderera submits the Concord stop lacks reasonable suspicion because the Concord Police failed to articulate facts that support the inference of Taderera's participation in a prior bank robbery or criminal activity underway.

The only criminal activity available to the officers' suspicions were bank robbery or attempted bank robbery. The sequence of events lends itself to neither conclusion. The officers were versed in the descriptors supplied in the BOLO. Neither the officers nor the government submit that the BOLO independently provided reasonable suspicion to stop motorists on the street. The only remaining issue is whether the officers' observation of Taderera's presence, head turn, and departure added enough to lead a reasonable officer to conclude that Taderera participated in a prior bank robbery or criminal activity was underway.

The officers drove right past Taderera's vehicle in order to park and continue watching.  The officers drove past Taderera and parked their own vehicle without initiating an investigatory stop. By this time they witness all articulated fact except Taderera's departure. The officers claim that Taderera departed quickly; yet they had enough time to proceed through an intersection, park their car, watch Taderera, exit their parking spot, and catch up to Taderera's car without light or sirens.

The officers observed the conduct a typical motorist. Under a totality of the circumstances, Taderera's conduct cannot be said to lead a reasonable officer to conclude that he participated in a bank robbery or criminal activity was underway.

Here, there is a dispute whether the officers stopped Taderera's car prior to or after learning the registration was revoked. The government submits that the officers stopped Taderera after learning the car registration was revoked. The police reports indicate that Taderera was stopped prior to the officers learning the car registration was revoked. *See* D.E. 54 at 2. The sequence reflected in Officer Koppenal's report is that Taderera's vehicle was stopped and the officers actually engaged with Taderera before receiving notification that the car registration was revoked.

Under a totality of the circumstances, the officers stopped Taderera based their suspicion that he participated in a prior bank robbery. But the facts they articulated do not adequately support that conclusion.

Respectfully submitted,

ALBERT TADERERA
By His Attorneys,

 /s/ *W. Jamiel Allen*
W. Jamiel Allen
AZ Bar # 024631

/s/ Amy Barsky
Amy Barsky
Cal. Bar # 270846

FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

**<u>Certificate of Service</u>**

  I, W. Jamiel Allen, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 19, 2018.

                /s/ W. Jamiel Allen